# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **STEPHANIE MOYER, as** | : | |
| **ADMINISTRATOR of the ESTATE OF** | : | |
| **VICTORIA JEANNETTE HERR,** | : | |
| | : | **No. 3:16-CV-01424** |
| **Plaintiff,** | : | |
| | : | **(KOSIK, J.)** |
| **v.** | : | **(MEHALCHICK, M.J.)** |
| | : | |
| **LEBANON COUNTY et al.,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

### PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT JEFFREY YOCUM, D.O.'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)

Jonathan H. Feinberg
Susan M. Lin
KAIRYS, RUDOVSKY, MESSING &
  FEINBERG LLP
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA  19106
215-925-4400
215-925-5365 (fax)

Nick Brustin
Emma Freudenberger
Alexandra Lampert
NEUFELD, SCHECK & BRUSTIN
99 Hudson Street, 8th Floor
New York, NY 10013
212-965-9081
212-965-9084 (fax)

*Counsel for Plaintiff*

October 7, 2016

# **TABLE OF CONTENTS**

I.   INTRODUCTION.........................................................................1

II.  COUNTER STATEMENT OF THE FACTS...............................3

III. COUNTER-STATEMENT OF ISSUES PRESENTED...............8

IV.  STANDARD OF REVIEW ...........................................................9

V.   ARGUMENT ................................................................................10

    A.   The Facts Pled In The Complaint Demonstrating Dr. Yocum's
        Knowledge Of Ms. Herr's Serious Medical Needs And Failure
        To Provide Adequate Treatment For Those Needs Support A
        Finding Of Deliberate Indifference......................................10

    B.   The Same Facts Demonstrating Dr. Yocum's Deliberate
        Indifference To Ms. Herr's Serious Medical Needs Support A
        Claim Of Professional Negligence........................................18

    C.   Dr. Yocum's Knowledge Of A Serious Risk Of Harm To Ms.
        Herr Supports A Claim For Intentional Infliction Of Emotional
        Distress.....................................................................................18

    D.   Ms. Moyer May Pursue A Violation Of The Common Law
        Duty To Protect Claim In Addition To Her Professional
        Negligence Claim.....................................................................19

VI.  CONCLUSION...............................................................................21

## TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009)....................................................9

*Atkinson v. Taylor*, 316 F.3d 257 (3d Cir. 2003)...........................................11, 13

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).....................................9

*Boykins v. Ambridge Area Sch. Dist.*, 621 F.2d 75 (3d Cir. 1980)..........................15

*Castro v. Cty. of Los Angeles*, -- F.3d --, 2016 WL 4268955 (9th Cir. Aug. 15, 2016).....................................................................................10

*Coward v. Lanigan*, No. 13-cv-2222, 2016 WL 1229074 (D.N.J. Mar. 29, 2016).10

*De'lonta v. Johnson*, 708 F.3d 520 (4th Cir. 2013)..........................................11

*Estelle v. Gamble*, 429 U.S. 97, 104 (1976)................................................11

*Evancho v. Fisher*, 423 F.3d 347 (3d Cir. 2005)............................................14, 15

*Fowler v. UPMC Shadyside*, 578 F.3d 203 (3d Cir. 2009)...................................9

*Gregg v. Georgia*, 428 U.S. 153 (1976).....................................................11

*Hall v. Penn. State. Police*, 570 F.2d 86 (3d Cir. 1978)....................................15

*Keahey v. Bethel Township*, 2012 WL 478936 (E.D. Pa. Feb. 15, 2012) ................9

*Keele v. Glynn Cty.*, 938 F. Supp. 2d 1270 (S.D. Ga. 2013) .................................12

*Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015) .........................................10

*Lemire v. Cal. Dept. Corrs. & Rehabilitation*, 726 F.3d 1062 (9th Cir. 2013).......12

*M.H. v. Cty. of Alameda*, 90 F. Supp. 3d 889 (N.D. Cal. 2013)..............................12

*Monmouth Cty. Corr. Inst. Inmates v. Lanzaro,* 834 F.2d 326 (3d Cir. 1987)........11

*Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575 (3d Cir. 2003)......................11

*Navolio v. Lawrence County*, 406 F. App'x 619 (3d Cir. 2011) ............................13

*Nicini v. Morra*, 212 F.3d 798 (3d Cir. 2000). ........................................................12

*Otero v. Etter*, No. 08-cv-282, 2011 WL 3806284  (W.D. Pa. Aug. 26, 2011) ......18

*Phillips v. County of Allegheny*, 515 F.3d 224 (3d Cir. 2008) .................................9

*Rankin v. SEPTA*, 606 A.2d 536 (Pa. Commw. Ct. 1992) .....................................19

*Rode v. Delarciprete*, 845 F.2d 1195 (3d Cir. 1988)..............................................17

*Pajas v. County of Monterey*, No. 16-cv-0945, 2016 WL 3648686 (N.D. Cal. July 8, 2016)..................................................................................................................12

*Seebold v. Prison Health Servs., Inc.*, 57 A.3d 1232 (Pa. 2012)............................19

*Thomas v. City of Philadelphia*, 574 A.2d 1205 (Pa. Commw. Ct.) .......................19

*United States ex rel. Walker v. Fayette Cty.,* 599 F.2d 573 (3d Cir. 1979).............13

*Vance v. Rumsfeld*, 701 F.3d 193 (7th Cir. 2012) ...................................................17

*West v. Keve,* 571 F.2d 158 (3d Cir. 1978)..............................................................11

*White v. Brommer*, 747 F. Supp. 2d 447 (E.D. Pa. 2010) ........................................9

## Statutes and Rules

42 U.S.C. § 1983 .......................................................................................................2

Fed. R. Civ. P. 12(b)(6) .............................................................................................9

## I.   INTRODUCTION

Victoria Jeannette Herr ("Ms. Herr") was admitted to the Lebanon County Correctional Facility ("LCCF") on March 27, 2015.  At that time, Defendant Jeffrey Yocum, DO ("Dr. Yocum"), as the medical director at LCCF, had a responsibility to ensure that inmates received adequate medical care.  In his role, Dr. Yocum was specifically aware that many inmates at LCCF were, in line with well-known national trends, entering the facility addicted to heroin and other opiate-based controlled substances.  Indeed, Dr. Yocum held himself out as an expert in the treatment of persons addicted to controlled substances.  Consistent with his experience and stated expertise, Dr. Yocum knew that heroin-addicted inmates would go through detoxification upon admission to LCCF.  He knew, further, that detox from heroin could lead to dangerous medical consequences, which, in turn, could be fatal.  And, he knew that, in order to prevent these serious consequences, consistent monitoring, evaluation and treatment was required.

When Ms. Herr entered LCCF, she candidly told correctional and medical staff that she had been abusing heroin and that she expected to detox.  Dr. Yocum knew of Ms. Herr's presence and knew that she would experience detox.  Over the next four days, Ms. Herr showed alarming signs that her detox was causing serious medical consequences.  She had constant diarrhea and vomiting and was unable to eat or retain fluids.  She was disoriented and in an altered state of consciousness.

Despite his knowledge of these symptoms, over that four-day period, Dr. Yocum took no action to ensure that Ms. Herr would be evaluated and monitored.  Nor, did he take any action to provide her with readily available treatment.

On the evening of March 31, 2015, Ms. Herr was weak from dehydration and could not stand or walk on her own power.  She was taken to the LCCF medical unit and seen by medical personnel who told Dr. Yocum of Ms. Herr's condition.  It was obvious that Ms. Herr was experiencing a medical emergency. Yet, Dr. Yocum failed to act.  He did not treat her and did not direct that she be sent to a hospital for critical medical intervention.  Shortly after Ms. Herr left the medical unit, she collapsed on the floor of her housing area, lost consciousness, and went into cardiac arrest. Finally, emergency services were called, and paramedics transported her to a hospital. Her condition, however, was irreversible, and she never regained consciousness. Five days later, on April 5, 2015, she died. She was 18 years old.

Plaintiff Stephanie Moyer ("Ms. Moyer"), the mother of Ms. Herr and the Administrator of her Estate, has brought this civil rights survival and wrongful death action under 42 U.S.C. § 1983 alleging that correctional and medical staff, including Dr. Yocum, were deliberately indifferent to Ms. Herr's serious medical needs in violation of the Fourteenth Amendment (Count I).  Ms. Moyer also claims that Dr. Yocum is liable for the torts of negligence (Count III), intentional

infliction of emotional distress (Count IV), and violation of the common law duty to protect (Count V).  Dr. Yocum has moved to dismiss all claims against him, arguing that the Complaint does not plead plausible facts to support those claims.[1] As demonstrated below, however, Dr. Yocum's arguments are based on significant misstatements of the law and the allegations in the Complaint.  The motion should be denied, and Ms. Moyer should be permitted to proceed to discovery regarding her claims against Dr. Yocum.

## II.    COUNTER STATEMENT OF THE FACTS

The facts relevant to the instant motion as pled in Ms. Moyer's Complaint, drawing all inferences in the light most favorable to Ms. Moyer as the non-moving party, are as follows: Dr. Yocum was the medical director at LCCF with supervisory authority over all clinical staff and was the final policymaker for Defendant Lebanon County with regard to all medical matters for prisoners at LCCF.  Complaint, ECF 1, at ¶ 9.  In this role, and also given his responsibilities as Lebanon County Coroner and as a reported expert in addiction medicine, Dr. Yocum was, as of March 2015, aware of increased patterns of heroin and opiate use in and around Lebanon County and, in particular, among young persons admitted to LCCF.  *Id.* at ¶ 27.  Indeed, Dr. Yocum stated in public comments that

---

[1] All other defendants named in the Complaint have filed a separate motion to dismiss.  ECF 20, 21.  Ms. Moyer's brief in opposition to that motion will be filed simultaneously to this submission.

heroin and opiate related deaths in Lebanon County increased dramatically in the years and months before March 2015. *Id.* Dr. Yocum was, likewise, aware that detoxification from heroin can result in several harmful and potentially fatal medical consequences, and that, accordingly, inmates experiencing detoxification have serious medical needs—particularly those who are heavy users of heroin. *Id.* at ¶¶ 28, 29. Those dangerous consequences include dehydration, electrolyte imbalance, seizures, and cardiac arrhythmias leading to sudden cardiac arrest. *Id.* at ¶ 30.

In view of these risks, basic standards of correctional healthcare known to Dr. Yocum required consistent monitoring of opiate-addicted persons admitted to LCCF. *Id.* at ¶¶ 31, 38. Necessary monitoring includes assessments, multiple times per day, of the detoxing person's vital signs (e.g., pulse, respiration, blood pressure, body temperature) and evaluation for serious health consequences of detox such as vomiting, diarrhea, and anxiety. *Id.* at ¶¶ 32-33.

On March 27, 2015, when Ms. Herr was admitted to LCCF on drug charges, she made clear to medical and correctional staff that she was addicted to heroin. *Id.* at ¶¶ 49-51. An officer created a written record noting that Ms. Herr was likely to go through detox and should be placed on thirty-minute "checks" for withdrawal. *Id.* at ¶ 51. On the morning of March 28, Ms. Herr met with a medical staff member and reported that she was a heavy user of heroin, injecting at least 10

4

bags of heroin every day. *Id.* at ¶ 53. She also reported that she was starting to experience withdrawal. *Id.* at ¶ 54. Dr. Yocum learned of this encounter and knew of Ms. Herr's history of prolonged and heavy heroin abuse and that she had begun to experience detox. *Id.* at ¶ 57. Dr. Yocum also knew that the medical staff member who had seen Ms. Herr conducted no examination of Ms. Herr—that is, neither an assessment of vital signs, nor an evaluation for symptoms of serious detox-related medical consequences. *Id.* at ¶¶ 56-57. Despite this knowledge, Dr. Yocum neither conducted any examination of Ms. Herr, nor did he direct that other medical professionals at LCCF examine Ms. Herr. *Id.* at ¶ 58.

Although Ms. Herr was supposed to be placed on a "withdrawal protocol" for the monitoring of vital signs and withdrawal-related symptoms, this did not occur. *Id.* at ¶¶ 59, 61. Dr. Yocum took no action to ensure that such examinations would occur, knowing that his failure to do so would result in Ms. Herr receiving no medical attention. *Id.* at ¶ 60. That lack of medical attention had devastating consequences for Ms. Herr; over the four days following the March 28 medical encounter, Ms. Herr's unmonitored detox caused a rapid and severe decline in her health. *Id.* at ¶ 62. She had repeated bouts of vomiting and constant diarrhea; her diarrhea was so extreme and uncontrolled that inmates on a work detail were several times each day summoned to clean Ms. Herr's soiled cell. *Id.* at ¶¶ 63-64. Eventually, correctional staff forced Ms. Herr to wear adult diapers. *Id.* at ¶ 65.

She did not eat and ingested only limited fluids. *Id.* at ¶ 66. She was delirious and detached from reality to the point that she experienced hallucinations which she described to other inmates as if they were real. *Id.* at ¶ 68. She was extremely weak with signs of altered consciousness; she appeared dazed and disoriented and could not stand, walk or sit up unassisted. *Id.* at ¶¶ 67-68.

Ms. Herr's symptoms made it obvious to anyone, including fellow inmates, that she had serious medical needs requiring treatment. *Id.* at ¶ 70. Those inmates urged correctional and medical staff to provide treatment for Ms. Herr. *Id.* Based on these reports, Dr. Yocum learned of Ms. Herr's condition, including the fact that she was experiencing vomiting and diarrhea, that she was showing signs of altered consciousness, and that she was not eating and drinking. *Id.* at ¶ 74. Despite that knowledge, and despite his understanding based on his experience and stated area of expertise that Ms. Herr's symptoms could lead to severe health consequences, including death, Dr. Yocum failed to provide medical attention to Ms. Herr. *Id.* at ¶ 75.

On the evening of March 31, 2015, after more than four days of untreated heroin detox, Ms. Herr was barely conscious. *Id.* at ¶ 82. She was taken to the medical unit where she was seen by two nurses. *Id.* at ¶ 89. Following that encounter, Dr. Yocum was informed of Ms. Herr's condition and thus knew that she was showing obvious signs of dehydration and that she had not been provided

with any medical examination or treatment. *Id.* at ¶ 90. Dr. Yocum thus knew, based on his experience and expertise, that Ms. Herr was experiencing a life-threatening medical emergency. *Id.* at ¶ 91. Despite that knowledge, Dr. Yocum made no effort to provide Ms. Herr with adequate treatment for her serious medical condition. *Id.*

Ms. Herr was returned to her housing area, and, upon arrival in her cell, fell to the floor and began vomiting large quantities of liquid. *Id.* at ¶ 95. She emitted a gasping sound, stopped breathing and had no pulse. *Id.* Some time later, paramedics arrived at LCCF and transported Ms. Herr to a hospital. *Id.* at ¶¶ 100-01. Ms. Herr's heart rhythm and respirations were revived, but, because she had been without oxygen for a prolonged period, her brain was severely damaged and she did not regain consciousness. *Id.* at ¶¶ 101-02. After transfer to a trauma center, Ms. Herr was placed on a ventilator; treatment in intensive care did not improve Ms. Herr's condition, and, after five days of hospitalization, she died. *Id.* at ¶¶ 108-09.

Nationally recognized correctional health standards of which Dr. Yocum was aware require a comprehensive mortality review following the death of an inmate. *Id.* at ¶ 117. Dr. Yocum, however, specifically elected not to proceed with a mortality review and, therefore, conducted no evaluation of the actions of medical staff, including his own, preceding Ms. Herr's death. *Id.*

## III.   COUNTER-STATEMENT OF ISSUES PRESENTED

A.      Whether the facts pled in the Complaint demonstrate that Dr. Yocum was aware of Ms. Herr's serious medical needs and failed to adequately address those needs and, as such, was deliberately indifferent in violation of the Fourteenth Amendment.

Suggested Answer: Yes.

B.      Whether the same facts demonstrating Dr. Yocum's deliberate indifference to Ms. Herr's serious medical needs support a state-law claim of professional negligence.

Suggested Answer: Yes.

C.      Whether the facts pled in the Complaint showing Dr. Yocum's extreme misconduct in failing to address Ms. Herr's serious and emergency medical condition support a state-law claim of intentional infliction of emotional distress.

Suggested Answer: Yes.

D.      Whether the facts pled in the Complaint showing Dr. Yocum's failure to protect Ms. Herr in violation of his recognized special relationship with her support a state-law claim of violation of the common law duty to protect.

Suggested Answer: Yes.

## IV.   STANDARD OF REVIEW

Following the Supreme Court's decision in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), when the Court considers a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), it conducts a two-part analysis.  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).  First, the Court "must accept all of the complaint's well-pleaded facts as true." *Id.* at 210.  Second, the Court "must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Iqbal*, 129 S. Ct. at 1950).  The "plausibility" analysis "will be 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* (quoting *Iqbal*, 129 S. Ct. at 1949).  In sum, the plausibility inquiry is not an exacting one.  *See White v. Brommer*, 747 F. Supp. 2d 447, 457 (E.D. Pa. 2010) (citing *Fowler*, 578 F.3d at 210; *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)) (stating that Court must determine "whether, under any reasonable reading, the plaintiff may be entitled to relief" and noting that "a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits"); *see also Keahey v. Bethel Township*, No. 11-cv-7210, 2012 WL 478936, at *3 (E.D. Pa. Feb. 15, 2012) (stating that "nothing in [*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)] or *Iqbal* has altered some of the fundamental underpinnings of the Rule 12(b)(6)

9

standard of review" and that the Federal Rules of Civil Procedure "require[] only a

short and plain statement of the claim showing that the pleader is entitled to relief

and need not contain detailed factual allegations").

## V.    ARGUMENT

### A.    The Facts Pled In The Complaint Demonstrating Dr. Yocum's Knowledge Of Ms. Herr's Serious Medical Needs And Failure To Provide Adequate Treatment For Those Needs Support A Finding Of Deliberate Indifference.

Ms. Moyer's federal constitutional claim alleging that Dr. Yocum failed to

provide adequate medical care to Ms. Herr while she was a pretrial detainee arises

under the Fourteenth Amendment and, under existing Third Circuit law, embodies

Eighth Amendment standards.[2]  Following established Supreme Court precedent, a

---

[2] The case law cited in this section follows the Third Circuit's binding precedent that claims of unconstitutional deprivation of adequate medical care are judged by the same standards whether brought by pretrial detainees or sentenced defendants. *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 581 (3d Cir. 2003); *Coward v. Lanigan*, No. 13-cv-2222, 2016 WL 1229074, at *4 n.3 (D.N.J. Mar. 29, 2016).  Ms. Moyer, however, expressly preserves the claim that, as a pretrial detainee, claims concerning deliberate indifference to Ms. Herr's serious medical needs should be judged by an objective reasonableness standard.  *See Castro v. Cty. of Los Angeles*, -- F.3d --, 2016 WL 4268955, at *7-8 (9th Cir. Aug. 15, 2016) (en banc) (citing *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015)) (pretrial detainee's failure-to-protect claim required showing that defendant "did not take reasonable available measures to abate…risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved").  As discussed below, Ms. Moyer has sufficiently alleged facts that meet the current standard: Dr. Yocum was subjectively aware of the serious risk to Ms. Herr's health, but deliberately did not provide adequate care.  The Complaint also meets the less-stringent *Kingsley* standard: a reasonable actor in Dr. Yocum's position would have appreciated the high degree of risk to Ms. Herr.

plaintiff establishes a § 1983 claim for unconstitutional denial of medical care in the prison context if the record shows that (1) the plaintiff had a serious medical need and (2) the defendants were deliberately indifferent to that serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

Deliberate indifference is found where medical personnel, in the course of the care they choose to provide, "opt for 'an easier and less efficacious treatment' of the inmate's condition." *Monmouth Cty. Corr. Inst. Inmates v. Lanzaro,* 834 F.2d 326, 347 (3d Cir. 1987) (quoting *West v. Keve,* 571 F.2d 158, 162 (3d Cir. 1978)). Deliberate indifference does not require, as Dr. Yocum suggests, the "unnecessary and wanton infliction of pain." Yocum Br. at 5 (quoting *Estelle*, 429 U.S. at 105-06).[3] To the contrary, the deliberate indifference inquiry focuses on whether the defendants "have…provided…*constitutionally adequate* treatment." *De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013) (emphasis in original); *see also Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003) ("[W]e have found deliberate indifference in situations where there was 'objective

---

[3] The language cited in Dr. Yocum's brief is taken out of context. The *Estelle* Court concluded that deliberate indifference to serious medical needs was equivalent to other Eighth Amendment claims, which, among other things, included "the unnecessary and wanton infliction of pain." *Estelle*, 429 U.S at 104 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)); *see also Atkinson v. Taylor*, 316 F.3d 257, 266 (3d Cir. 2003) ("In *Estelle*, the Supreme Court concluded that deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain, which violates the Eighth Amendment.")

evidence that [a] plaintiff had serious need for medical care,' and prison officials ignored that evidence") (quoting *Nicini v. Morra*, 212 F.3d 798, 815 n.14 (3d Cir. 2000)).

In light of these standards, courts around the country have found that when medical professionals are aware of serious medical needs caused by withdrawal from addictive substances, the failure to adequately address those symptoms amounts to deliberate indifference. *See Pajas v. County of Monterey*, No. 16-cv-0945, 2016 WL 3648686, at *10 (N.D. Cal. July 8, 2016) (citing *Lemire v. Cal. Dept. Corrs. & Rehabilitation*, 726 F.3d 1062, 1083 (9th Cir. 2013)) (deliberate indifference shown where nurse "knew Decedent was to be monitored for opiate detoxification, had vomited in his cell, and was lying on the floor stating that he could not move" but did not check decedent's vital signs); *M.H. v. Cty. of Alameda*, 90 F. Supp. 3d 889, 896 (N.D. Cal. 2013) (nurse could be found deliberately indifferent for recognizing decedent's risk of severe alcohol withdrawal symptoms but failing "to follow through with this assessment" by checking blood alcohol levels, performing laboratory tests, administering medications, or otherwise treating symptoms); *Keele v. Glynn Cty.*, 938 F. Supp. 2d 1270, 1296 (S.D. Ga. 2013) (denying summary judgment where nurse "postponed [decedent's] access to medical treatment by failing to call…emergency

medical personnel" during three-hour night shift where decedent reported withdrawal from opiates).

Dr. Yocum does not appear to contest the fact that Ms. Herr had serious medical needs due to heroin detox.[4]  Instead, he argues that the Complaint does not plead facts showing he was personally aware of Ms. Herr's serious medical needs. This contention, however, ignores the multiple facts pled in the Complaint demonstrating Dr. Yocum's direct knowledge of Ms. Herr's alarming and deteriorating condition, including the following:

- That, as of March 27, Dr. Yocum knew Ms. Herr had been admitted to LCCF, knew she had a history of heavy heroin use, knew she was already experiencing detox, knew she required an assessment of vital signs and evaluation of detox-related symptoms, and knew medical staff had not conducted this assessment or evaluation, but that he failed to conduct any assessment and evaluation and failed to direct any other medical personnel to do so.  Complaint at ¶¶ 56-58.

- That, between March 28 and March 31, Dr. Yocum learned that Ms. Herr's health declined rapidly as she suffered persistent diarrhea and

---

[4] Nor could he so contend.  *See Navolio v. Lawrence County*, 406 F. App'x 619, 622 (3d Cir. 2011)  (citing *Atkinson,* 316 F.3d at 266; *United States ex rel. Walker v. Fayette Cty.,* 599 F.2d 573, 576 (3d Cir. 1979)) ("We assume, for purposes of this appeal, the chemical withdrawal [plaintiff] experienced during his detention was a serious medical need.").

vomiting, was hallucinating and in an altered state of consciousness, did not eat or drink, and could not walk, stand or sit on her own, but that, despite this knowledge and the urging of inmates to provide Ms. Herr with immediate treatment, Dr. Yocum failed to provide medical intervention for Ms. Herr.  *Id.* at ¶¶ 60, 63-68, 70, 74-75.

• That, on the evening of March 31, when Ms. Herr was barely conscious, Dr. Yocum learned Ms. Herr was showing obvious signs of dehydration and had not received any examination or treatment, and, given his experience, he knew these circumstances constituted a life-threatening medical emergency, but, despite that knowledge, he failed to either examine Ms. Herr himself or ensure she would receive emergency medical attention.  *Id.* at ¶¶ 82, 89-91.

Dr. Yocum contends that the first two points outlined above are somehow insufficient because the Complaint does not *also* allege exactly when and how, in the first four days of her incarceration, he learned about Ms. Herr and her declining condition.  In support of this contention, Dr. Yocum cites *Evancho v. Fisher*, 423 F.3d 347 (3d Cir. 2005), where the plaintiff, an employee of a state law enforcement agency, alleged that Pennsylvania's Attorney General improperly transferred her to a lesser position.  The Third Circuit affirmed the dismissal of the claims against the Attorney General because the complaint did "not contain even a

remote suggestion that Attorney General Fisher had contemporaneous, personal knowledge of her transfer and acquiesced in it." *Id.* at 353.

This case is far different. Ms. Moyer does not merely *suggest*, but specifically (and plausibly) pleads that Dr. Yocum directly learned of Ms. Herr's condition.[5] Dr. Yocum was the medical director at a small jail and the only physician known to have involvement in Ms. Herr's case. In *Evancho* by contrast, absent allegations that the Attorney General had personal knowledge of the plaintiff's transfer, it was implausible that a high-ranking official of a large state agency would have anything to do with the status of a rank-and-file employee. *See id.* at 354 (would not be reasonable to assume Attorney General had personal knowledge of plaintiff "simply because of his position as the head of the Office of the Attorney General" as plaintiff "had at least three levels of supervision"). Here, there is an unquestionably reasonable inference that, given Ms. Herr's serious condition and Dr. Yocum's position as the only physician treating Ms. Herr, and in particular, given Dr. Yocum's declaration of expertise in treating addiction related

---

[5] *Evancho*'s statement that "a civil rights complaint is adequate where it states the conduct, time, place, and persons responsible," 423 F.3d at 353 (citing *Boykins v. Ambridge Area Sch. Dist.*, 621 F.2d 75, 80 (3d Cir. 1980)), does not, as Dr. Yocum suggests, impose a heightened pleading standard requiring additional facts about Dr. Yocum's knowledge. Instead, the citation refers to the basic rule of notice pleading, that a complaint need only allege "the conduct violating his rights (racially discriminatory activity), time (March 17, 1976), place (King of Prussia) and those responsible (various state and bank officials)." *Boykins*, 621 F.2d at 80 (quoting *Hall v. Penn. State. Police*, 570 F.2d 86, 89 (3d Cir. 1978)).

conditions, he would be alerted to the presence of a detoxing inmate. At this early stage, such an inference is more than sufficient to satisfy the plausibility test.

As to the third point above concerning events on March 31, Dr. Yocum employs a cramped reading of the Complaint and contends that he merely learned that "medical staff encountered a dehydrated inmate." Yocum Br. at 10. But that is not what the Complaint says. The Complaint alleges that on March 31 Dr. Yocum was "informed of Ms. Herr's condition," Complaint at ¶ 90, a phrase which incorporates earlier allegations describing that condition. The "condition" included, among other things, days of vomiting and uncontrolled diarrhea, *id.* at ¶¶ 63-65; the inability to eat or ingest fluids*, id.* at ¶ 66; deliriousness, hallucinations, and incoherence*, id.* at ¶¶ 67, 80; and extreme weakness including the inability to sit, stand, or walk unassisted, *id.* at ¶ 68. Dr. Yocum thus did not merely learn about "a dehydrated inmate." He learned that Ms. Herr had the telltale signs of "a life-threatening medical emergency." *Id.* at ¶ 91. His failure to act in these circumstances is quintessential deliberate indifference.

Dr. Yocum contends, further, that it is not plausible that he learned of a medical emergency because the persons who provided him with that information returned Ms. Herr to her cell. Yocum Br. at 10. The implication of this assertion is that it is not plausible that Dr. Yocum could have acted improperly. That contention is one for trial. At this stage, the core facts of the Complaint

16

demonstrate that (1) an 18-year-old woman with a known medical condition, ordinarily treatable with proper monitoring and evaluation, died after days of obvious symptoms of severe illness, (2) there was only one physician assigned to provide medical care to inmates with that condition, (3) that physician had a stated specialty in the treatment of addiction related conditions,[6] and (4) despite the physician's knowledge of her severe and life-threatening medical status, and of the treatment necessary to address that emergency, it was not provided.  In these circumstances, it is undeniably plausible that the physician, Dr. Yocum, acted with deliberate indifference to Ms. Herr's serious medical needs. For these reasons, Dr. Yocum's request to dismiss Ms. Moyer's constitutional claim against him should be denied.[7]

---

[6] References to Dr. Yocum's knowledge of trends in opiate use and his claimed expertise in the area of addiction-related illness are probative of the point that Dr. Yocum knew and appreciated the seriousness of Ms. Herr's condition. Accordingly, Dr. Yocum's citations to *Rode v. Delarciprete*, 845 F.2d 1195, 1208 (3d Cir. 1988), where a Governor could not be found to have personal knowledge of harassment of a state employee based on newspaper articles, and *Vance v. Rumsfeld*, 701 F.3d 193, 204 (7th Cir. 2012), where the court noted that a prison warden who knows generally about prison violence cannot be held liable for all violence related injuries, are inapposite to the issues presented in this case.

[7] If there were any doubt as to the plausibility of Ms. Moyer's deliberate indifference allegations—there is not—it is resolved by the additional allegations that Dr. Yocum failed to comply with recognized correctional healthcare procedures requiring a mortality review following an inmate death.  This is probative of Dr. Yocum's intent to cover up and conceal wrongdoing and, therefore, supports the plausibility of Ms. Moyer's deliberate indifference claim.

**B.**     **The Same Facts Demonstrating Dr. Yocum's Deliberate Indifference To Ms. Herr's Serious Medical Needs Support A Claim Of Professional Negligence.**

Dr. Yocum makes no independent substantive argument as to Ms. Moyer's negligence claim and only incorporates the same arguments he makes as to Ms. Moyer's Fourteenth Amendment deliberate indifference claim.  Because, as demonstrated above, the facts in the Complaint support a deliberate indifference claim, they, likewise, support a professional negligence claim, and Dr. Yocum's request to dismiss that claim should be denied.

**C.**     **Dr. Yocum's Knowledge Of A Serious Risk Of Harm To Ms. Herr Supports A Claim For Intentional Infliction Of Emotional Distress.**

As with his argument concerning Ms. Moyer's professional negligence claim, Dr. Yocum incorporates his arguments on the deliberate indifference claim and argues that his lack of personal knowledge concerning a risk to Ms. Herr supports dismissal.  As demonstrated above, however, the Complaint details extensive personal knowledge on the part of Dr. Yocum concerning Ms. Herr's serious illness and need for emergency treatment, and, accordingly, his failure to act in the face of those needs supports a claim for intentional infliction of emotional distress.  *See Otero v. Etter*, No. 08-cv-282, 2011 WL 3806284, at *1, *4 (W.D. Pa. Aug. 26, 2011) (denying summary judgment on Eighth Amendment deliberate indifference claim and intentional infliction of emotional distress claim

based on plaintiff's allegations that defendant recklessly drove prison transport van resulting in crash and serious injuries).

### D.   Ms. Moyer May Pursue A Violation Of The Common Law Duty To Protect Claim In Addition To Her Professional Negligence Claim.

Ms. Moyer's claim that Dr. Yocum violated the common law duty to protect is brought pursuant to a line of Pennsylvania cases holding that while tort law does not generally impose a duty to protect an endangered person, there is an exception when the defendant has a "special relationship" with the plaintiff.  In the lead case on this issue, *Rankin v. SEPTA*, 606 A.2d 536 (Pa. Commw. Ct. 1992), the court explained that liability can be established upon proof of three elements: that the defendant: (1) was aware of the plaintiff's "particular situation or unique status"; (2) "had knowledge of the potential of the particular harm" which the plaintiff suffered; and (3) voluntarily assumed to protect the plaintiff from the precise harm which was occasioned.  *Id.* at 538 (quoting *Thomas v. City of Philadelphia*, 574 A.2d 1205, 1206 (Pa. Commw. Ct.), *pet. for all. of app. denied,* 593 A.2d 429 (1990)).

Dr. Yocum contends that this claim is precluded by *Seebold v. Prison Health Servs., Inc.*, 57 A.3d 1232, 1245-46 (Pa. 2012), in which the court held that prison physicians do not have an affirmative duty to warn third party correctional officers of a prisoner's communicable disease.  Although the *Seebold* court noted that,

generally, courts do not impose "new affirmative duties," that reasoning, and the disposition of the case, are irrelevant to a duty to protect claim which is based on a long-recognized duty.  Ultimately, Ms. Moyer's claim that Dr. Yocum violated his common law duty to protect Ms. Herr based on his special relationship to her may be duplicative of a professional negligence claim.  *See Seebold*, 57 A.3d at 1246-47 (noting that physicians may be liable for professional negligence "by virtue of the special relationship of care they assume").  But, nothing in *Seebold* precludes, at this early stage, allowing claims that *might* be duplicative to proceed.  Dr. Yocum's argument provides no basis for dismissal of this claim.

## VI.   CONCLUSION

For the foregoing reasons, Defendant Jeffrey Yocum, D.O.'s motion to dismiss should be denied.

Respectfully submitted,


/s/ Jonathan H. Feinberg
Jonathan H. Feinberg
Susan M. Lin
KAIRYS, RUDOVSKY, MESSING &
  FEINBERG LLP
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA  19106
215-925-4400
215-925-5365 (fax)

Nick Brustin
Emma Freudenberger
Alexandra Lampert
NEUFELD, SCHECK & BRUSTIN
99 Hudson Street, 8th Floor
New York, NY 10013
212-965-9081
212-965-9084 (fax)

*Counsel for Plaintiff*

## **CERTIFICATE OF WORD COUNT**

I, Jonathan H. Feinberg, hereby certify that the foregoing Brief complies

with Local Civ. R. 7.8(b)(2) in that it consists of 4,925 words.

/s/ Jonathan H. Feinberg
Jonathan H. Feinberg

## <u>CERTIFICATE OF SERVICE</u>

I, Jonathan H. Feinberg, hereby certify that the foregoing Brief in

Opposition to Jeffrey Yocum, D.O.'s Motion to Dismiss Pursuant to Fed. R. Civ.

P. 12(b)(6) was, on October 7, 2016, filed via the Court's CM/ECF system and,

therefore, served on the following:

> Andrew H. Foulkrod, Esq.
> Eric Lauerman, Esq.
> Cipriani & Werner, P.C.
> 1011 Mumma Road, Suite 201
> Lemoyne, PA 17043-1145
>
> *Counsel for Defendant Dr. Jeffrey Yocum*
>
>
> David L. Schwalm, Esq.
> Matthew R. Clayberger, Esq.
> Thomas, Thomas & Hafer, LLP
> 305 North Front Street, 6th Floor
> POB 999
> Harrisburg, PA 17108-0999
>
> *Counsel for Lebanon County Defendants*

/s/ Jonathan H. Feinberg
Jonathan H. Feinberg